UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN P. PIGSLEY, a/k/a "John P. Pigsley, Sr." and "Big John,"<br><br>         Defendant | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Criminal No. 23cr10093<br><br>Violations:<br><br>Counts One-Five: Wire Fraud<br>(18 U.S.C. § 1343)<br><br>Count Six: Conspiracy to Commit Wire Fraud<br>(18 U.S.C. § 1349)<br><br>Counts Seven-Twelve: Attempt to Evade or<br>Defeat Tax<br>(26 U.S.C. § 7201)<br><br>Count Thirteen: Filing a False Tax Return<br>(26 U.S.C. § 7206(1))<br><br>Counts Fourteen-Seventeen: Structuring<br>Transactions to Evade Reporting Requirements<br>(31 U.S.C. § 5324)<br><br>Forfeiture Allegations:<br>(18 U.S.C. §§ 981(a)(1)(C); 31 U.S.C. § 5317;<br>and 28 U.S.C. § 2461) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.     Keolis Commuter Services ("Keolis") was the Massachusetts subsidiary of Keolis

S.A., an international transportation company headquartered in Paris, France.  Since 2014, Keolis

has operated and maintained the Massachusetts Bay Transportation Authority (the "MBTA")

commuter rail system, which carries more than 127,000 passengers daily throughout greater

1

Boston.  According to the contract, the MBTA paid Keolis net annual fees ranging from approximately $291 million to $349 million.

2.      The defendant John Pigsley ("PIGSLEY") was a resident of Beverly, Massachusetts.  PIGSLEY previously worked for Keolis's predecessor beginning at least as early as 2004 and was hired by Keolis in or around 2014 as the Assistant Chief Engineer of Facilities. PIGSLEY was responsible for the maintenance of MBTA Commuter Rail Facilities and their engineering operations, including handling corrective repair and project management for assets and maintenance, and ordering and approving his subordinates' orders of electrical supplies from outside vendors for Keolis.  PIGSLEY also owned and operated a construction company, the Pigman Group, that provided general contracting, plumbing, electrical, heating, air conditioning, and general landscaping services.

3.      John Rafferty ("Rafferty") was PIGSLEY's friend and the general manager of LJ Electric, Inc. ("LJ Electric"), a Massachusetts corporation that was one of Keolis's largest suppliers of electrical equipment.  From 2014 through 2021, for example, Keolis paid LJ Electric over $17 million, purportedly for electrical supplies.  PIGSLEY had authority to purchase electrical supplies from LJ Electric at least between 2014 and 2021.

4.      The Internal Revenue Service (the "IRS") was an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States.

## THE SCHEME TO DEFRAUD KEOLIS

5.      Starting at least as early as July 2014 and continuing until at least November 2021, PIGSLEY defrauded Keolis by (a) approving and causing Keolis to pay false LJ Electric invoices for electrical equipment and services never delivered to Keolis, and (b) causing Keolis to order amounts of copper wire, which PIGSLEY diverted and scrapped for cash.

A.      *The False LJ Electric Invoice Conspiracy*

6.      Starting at least as early as July 2014 and continuing until at least November 2021, PIGSLEY and Rafferty conspired to defraud Keolis.  PIGSLEY directed Rafferty to purchase vehicles, construction equipment, construction supplies, and other items for PIGSLEY, Pigman Group, and others.  PIGSLEY directed Rafferty to recover the cost of the items purchased for PIGSLEY, Pigman Group, and others by submitting false and fraudulent LJ Electric invoices to Keolis.  The fraudulent LJ Electric invoices included a percentage profit that Rafferty kept for himself.  In total, Rafferty spent more than $3 million on purchases for PIGSLEY, Pigman Group, and others, and Keolis paid Rafferty more than $4 million based on false LJ Electric invoices.

7.      The object of the conspiracy was to devise and carry out a scheme to defraud and obtain money and property from Keolis by means of false or fraudulent pretenses and representations.  The principal purpose of the conspiracy and the scheme to defraud was to enrich PIGSLEY, Rafferty, and their friends and families.

8.      Among the manner and means by which PIGSLEY, Rafferty, and co-conspirators known and unknown to the Grand Jury carried out the conspiracy and the scheme to defraud were the following:

3

        a.      Purchasing goods and materials for PIGSLEY, Pigman Group, PIGSLEY's friends and family members, and Rafferty's family members using Rafferty's and LJ Electric's funds;

        b.      Repaying Rafferty for the costs of these goods and materials by submitting, via email, false LJ Electric invoices to Keolis for items that were never provided to Keolis;

        c.      Manipulating the false LJ Electric invoices to ensure that PIGSLEY could approve the invoices without obtaining multiple bids or supervisor approval under Keolis's purchasing policies;

        d.      Inflating the false LJ Electric invoices to include a 10 to 30 percent profit to compensate Rafferty for his participation in the fraud scheme;

        e.      Submitting the false LJ Electric invoices to PIGSLEY and Keolis electronically using a Google email account;

        f.      Approving the false LJ Electric invoices; and

        g.      Directing more Keolis business to LJ Electric and Rafferty.

9.      Between 2014 and 2021, Rafferty purchased the following, among other items, for PIGSLEY, Pigman Group, and others:

        a.      At least $1 million in home building materials and services;

        b.      At least nine (9) trucks totaling over $470,000, including three (3) Ford F550s and four (4) Ford F350s;

        c.      At least seven (7) Bobcat machines, each of which cost more than $70,000, as well as various smaller Bobcat machines, accessories and attachments;

d.      Over $110,000 in doors and windows for construction projects including PIGSLEY's Beverly, MA home and garage;

e.      Over $20,000 in countertops and tile for PIGSLEY's Beverly, MA home;

f.      Over $24,000 in designer cabinets for the home of one of PIGSLEY's friends;

g.      Over $10,000 in window treatments for PIGSLEY's Beverly, MA home; and

h.      A 2019 Heartland Fuel 352 Camper, at a cost of more than $54,000.

10.      PIGSLEY and Rafferty communicated by cellular telephone, text message and email regarding their scheme to defraud Keolis.  For example:

a.      On or about June 10, 2015, PIGSLEY forwarded to Rafferty an email from an insulation company with an estimate for work on a home owned by PIGSLEY's relative, in the amount of $11,680.  In the email to Rafferty, Pigsley stated, "Any way of helping me with this? Start billing now?"  Rafferty responded on the same date, in part, "what can I use to bill? I have ballasts bulbs ss enclosures and discos for the wire now I about 20plus grand? . . . have the guy call me for credit card looks like he wants $3894 to start".  On or about June 10 and 12, 2015, Rafferty emailed PIGSLEY at least three false LJ Electric invoices, one for two "DISCOs" totaling approximately $3,900, one for "BALLASTs" totaling approximately $4,088 and one for multiple items totaling approximately $2,206.  PIGSLEY approved the false invoices, causing Keolis to pay LJ Electric for electrical supplies that were never delivered to Keolis.

b.      On or about January 14, 2016, PIGSLEY sent an email to Rafferty forwarding a quote for $9,020 in home construction materials including exterior doors, shingles, plywood, and paint.  The quote listed PIGSLEY as the "sold to" party. PIGSLEY wrote to Rafferty, "9k order at [home construction supply store].  Can we do a contactor and a couple odds and ends?"  On or about January 15, 2016, Rafferty emailed PIGSLEY a false LJ Electric invoice for a "CONTACTOR," totaling approximately $9,890.  PIGSLEY approved the false invoice, causing Keolis to pay LJ Electric for electrical supplies that were never delivered to Keolis.

c.      On or about October 10, 2017, PIGSLEY forwarded to Rafferty an email from an auction website attaching a notice that PIGSLEY was currently the highest bidder for a 2012 Bobcat E45 Mini Excavator, with a maximum bid of $23,000. PIGSLEY's email to Rafferty read, "This ok?" and Rafferty responded, "Should be fine What can we use to bill that much I need to do some ballasts and lamps for other stuff now". On or about October 10 and 11, 2017, Rafferty emailed PIGSLEY three false LJ Electric invoices for electrical items including two "CONTACTORs" totaling approximately $19,780 and multiple "BALLASTS" and "LAMPS" totaling approximately $3,168.  PIGSLEY approved the false invoices, and Keolis paid LJ Electric for electrical supplies that were never delivered to Keolis.

d.      On or about January 24, 2018, PIGSLEY sent an email to Rafferty forwarding a quote for approximately $39,000 in home construction materials.  Later that day, Rafferty responded, "WHAT IS THIS BILL OF MATERIAL FOR?" and PIGSLEY replied, "Ryegate. Haven't bought it yet. That's what I said this morning there will be a

6

big order coming." At the time, PIGSLEY was renovating a home he owned in Ryegate, Vermont. Rafferty replied, "OK I will get those 2 contactors to start anyway". On or about January 24, 2018 and January 25, 2018, Rafferty emailed PIGSLEY two false LJ Electric invoices for two "CONTACTORs," totaling approximately $19,780. PIGSLEY approved the false invoices, and Keolis paid LJ Electric for electrical supplies that were never delivered to Keolis.

       e.      On or about June 5, 2018, at approximately 2:33 p.m., PIGLSEY forwarded to Rafferty a $1,181.74 quote for construction materials including roofing materials, primer, and insulation plates. PIGSLEY wrote to Rafferty, "Can you take care of this? Want to get the roof on this weekend I think". Rafferty replied, "Where is it going?" To which PIGSLEY replied "[Street name]," which referred to a construction project that PIGSLEY was performing for Rafferty's family member.

       f.      On or about August 29, 2019, at approximately 1:21 p.m., Rafferty emailed a Bobcat salesperson writing, "I was the one paying for Johns bobcat anything you can do on the price to offset the credit card fees? I can pay you today for the 82 grand on my credit card and john can pick up tomorrow". On or about August 30, 2019, Rafferty purchased a 2019 Bobcat E55 for PIGSLEY for $80,887. Between on or about August 27, 2019 and August 30, 2019, Rafferty emailed PIGSLEY three false LJ Electric invoices totaling approximately $95,765. PIGSLEY approved the false invoices, and Keolis paid LJ Electric for electrical supplies and services that were never delivered to Keolis.

g.      On or about October 7, 2020, at approximately 6:28 p.m., PIGSLEY

forwarded an email to Rafferty, attaching a quote for a 2020 T76 T4 Bobcat Compact

Track Loader for $77,273.  In the email, PIGSLEY instructed Rafferty, "Start billing

please."  On or about October 15, 2020, Rafferty paid $79,590 ($77,273 for the machine

and a $2,318 credit card processing fee) for the 2020 T76 T4 Bobcat Compact Track

Loader for PIGSLEY.  Between on or about October 14, 2020 and October 25, 2020,

Rafferty emailed PIGSLEY seven false LJ Electric invoices totaling approximately

$83,098.  PIGSLEY approved the false invoices, and Keolis paid LJ Electric for electrical

supplies and services that were never delivered to Keolis.

h.      On or about October 25, 2021, Rafferty emailed PIGSLEY a false LJ

Electric invoice for a "BREAKER LEVEL 1 REPAIR," in the amount of approximately

$8,976.  On or about October 27, 2021, at approximately 9:19 a.m., PIGSLEY texted

Rafferty, "Sent the 7k breaker repair right through. No questions. They said it's only for

Material the 5k."  Rafferty responded, "Good We can do a larger one next week."

PIGSLEY's reference to "5k" referred to Keolis's recently announced policy of requiring

purchases of materials over $5,000 to go through an automated, electronic procurement

system which involved additional levels of approval and scrutiny.

11.     In total, Rafferty paid for more than $3 million in goods for PIGSLEY and others,

and Keolis paid LJ Electric more than $4 million based on the false invoices Rafferty submitted

and PIGSLEY approved.

B.     *Copper Wire Scrapping*

12.     Starting at least as early as in or around 2016 and continuing until in or around 2021, PIGSLEY stole copper wire that Keolis purchased at his direction and sold the copper wire to scrap metal businesses, keeping the cash proceeds for himself.

13.     As part of the scheme, before in or around November 2020, PIGSLEY made multiple orders for industrial gauge copper wire from several of Keolis's electrical suppliers, including LJ Electric, each month.  Although PIGSLEY ordered hundreds of thousands of dollars in copper wire each year, PIGSLEY ensured that each invoice was less than $15,000 so that PIGSLEY was not required to get multiple bids or seek additional authorization to approve the invoice.  In total, Keolis ordered more than $13.1 million in copper wire from in or around 2016 through in or around October 2020.  PIGSLEY made most of those copper wire purchases. Keolis did not need or use the majority of the copper wire PIGSLEY ordered.

14.     In or around November 2020, Keolis launched a request for quotations process for copper wire, whereby Keolis—with PIGSLEY's input—estimated the amounts of copper wire it would need for a three-month period and requested that vendors bid for a short-term fixed cost supply contract.  Keolis awarded LJ Electric the copper wire contracts for four periods: November 2020 through January 31, 2021, February 1, 2021 through April 30, 2021, May 1, 2021 through July 31, 2021, and August 1, 2021 through October 31, 2021.

15.     As part of the scheme, between in or around November 2020 and October 2021, PIGSLEY made multiple orders for industrial gauge copper wire from LJ Electric, as Keolis's sole contracted vendor.  Because PIGSLEY's purchases did not generally exceed the contracted amounts for the three-month time periods, he was able to order large amounts of copper wire

from LJ Electric without additional approvals.  In total, Keolis ordered more than $2 million in copper wire from LJ Electric between in or around November 2020 and in or around October 2021, and the vast majority of the copper wire orders were placed and approved by PIGSLEY. Keolis did not need or use most of the copper wire PIGSLEY ordered.

16.     Keolis did not inventory or otherwise track copper wire purchases, and often vendors delivered legitimate copper wire purchases directly to Keolis's work sites.   PIGSLEY was therefore able to hide his theft of the copper wire by either personally picking up copper wire orders from vendors, or by having copper wire orders delivered to his Beverly home. PIGSLEY then personally transported the copper wire to scrap metal businesses, trading the wire for thousands of dollars in cash several times a month, and sometimes more than once a day.

17.     In total, PIGSLEY obtained more than $4.5 million in cash by stealing and scrapping copper wire paid for by Keolis.

<u>THE SCHEME TO DEFRAUD THE IRS</u>

18.     Between in or around 2014 and 2022, PIGSLEY defrauded the IRS by failing to withhold and pay federal income taxes on income he received in tax years 2014 through 2021. Such income included: (i) vehicles, equipment, and services that Rafferty provided PIGSLEY under the false invoicing scheme and (ii) cash PIGSLEY received from scrapping copper wire intended for and purchased by Keolis.

19.     Individual taxpayers generally are required to accurately report each year to the IRS their income and attendant tax obligations on a Form 1040, U.S. Individual Income Tax Return ("Form 1040").  The IRS uses Form 1040 to assess taxpayers' tax liability.

20.     In or around April 2016, PIGSLEY electronically filed or caused to be electronically filed through his tax preparer Forms 1040 for the tax years 2014 and 2015. PIGSLEY declared under penalty of perjury that the information submitted in the 2014 and 2015 Forms 1040 was true, correct, and complete.  PIGSLEY and his wife filed jointly and reported total income of $98,212 for 2014 and $98,747 for 2015, which included wages from Keolis and PIGSLEY's wife's employer.  On Schedules C, Profit or Loss From Business ("Schedules C") filed with the returns, PIGSLEY reported losses from his contracting business of $3,304 in 2014 and $4,451 in 2015.  The only other income PIGSLEY reported to the IRS for those years was a $13,927 pension distribution in 2014, and $3,870 in gambling winnings in 2015.  According to the returns, PIGSLEY and his wife owed $4,893 in taxes for 2014, and $2,099 in taxes for 2015, which taxes were paid in 2017.

21.     PIGSLEY did not include any items or services that Rafferty provided PIGSLEY under the false invoicing scheme on his 2014 or 2015 tax returns.

22.     On or before July 23, 2020, PIGSLEY prepared or caused to be prepared Forms 1040 for the tax years 2016, 2017, 2018 and 2019, identified as a joint tax returns with his wife. On the Forms 1040, PIGSLEY and his wife listed their income as follows:

a.      For tax year 2016, PIGSLEY reported wages from Keolis and PIGSLEY's wife's employer totaling approximately $108,181.  On a 2016 Schedule C, PIGSLEY listed income from his contracting business of $3,149.  According to the return, PIGSLEY and his wife claimed a federal tax refund in the amount of $2,708.

b.      For tax year 2017, PIGSLEY reported wages from Keolis and PIGSLEY's wife's employer totaling approximately $112,741.  On a 2017 Schedule C, PIGSLEY listed

11

income from his contracting business of $1,962. The only other income listed on the 2017 Form 1040 was $8,000 in gambling winnings. According to the return, PIGSLEY and his wife owed $3,713 in taxes for 2017.

        c.      For tax year 2018, PIGSLEY reported wages from Keolis and PIGSLEY's wife's employer totaling approximately $111,774. The Form 1040 did not include a 2018 Schedule C for PIGSLEY's contracting business, nor was there a profit or loss associated with the business listed on the Form 1040. According to the return, PIGSLEY and his wife owed $791 in taxes for 2018.

        d.      For tax year 2019, PIGSLEY reported wages from Keolis and PIGSLEY's wife's employer totaling approximately $106,056. The Form 1040 did not include a Schedule C for PIGSLEY's contracting business, nor was there a profit or loss associated with the business listed on the Form 1040. According to the return, PIGSLEY and his wife owed $265 in taxes for 2019.

23.     PIGSLEY did not include the following income on the 2016, 2017, 2018, and 2019 returns: (i) vehicles, equipment, and services that Rafferty provided PIGSLEY under the false invoicing scheme, and (ii) cash PIGSLEY received from scrapping copper wire intended for and purchased by Keolis.

24.     PIGSLEY mailed the 2016, 2017, 2018 and 2019 returns to the IRS in or around July 2020, but the Forms 1040 were not signed by PIGSLEY or his wife. Accordingly, the IRS sent the Forms 1040 back to PIGSLEY with instructions to sign the Forms 1040 and send them back to the IRS.

25.    PIGSLEY mailed the 2016, 2017, 2018 and 2019 returns to the IRS a second time in or around April 2021, but again the Forms 1040 still were not signed by PIGSLEY or his wife. Accordingly, the IRS sent the Forms 1040 back to PIGSLEY with instructions to sign the Forms 1040 and send them back to the IRS.

26.    On or about March 12, 2022, the IRS received the 2016 return by mail for the third time.  The 2016 Form 1040 was signed by PIGSLEY and dated March 8, 2022.  By signing the return, PIGSLEY affirmed, "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and accurately list all amounts and sources of income I received during the tax year."

27.    PIGSLEY failed to file personal tax returns with the IRS for the tax years 2020 and 2021.

28.    Between 2014 and 2021, PIGSLEY deposited approximately over $1,985,000 in cash into bank accounts held in the names of PIGSLEY personally and the Pigman Group.

29.    The Bank Secrecy Act, Title 31 U.S.C. §§ 5311-5330, requires that banks and other financial institutions file Currency Transaction Reports with the United States Department of the Treasury for cash transactions over $10,000.  Between 2014 and 2021, PIGSLEY's individual cash deposits were always less than $10,000; the largest cash deposit PIGSLEY made was approximately $9,683.  On at least twelve dates between 2017 and 2021, PIGSLEY made multiple deposits of cash on one day, with each deposit less than $10,000 but the total deposits for each date exceeding $10,000.

COUNTS ONE—FIVE
Wire Fraud
(18 U.S.C. § 1343)

The Grand Jury charges:

30.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-17 of this Indictment.

31.     On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendant,

JOHN P. PIGSLEY,
a/k/a "John P. Pigsley, Sr." and "Big John,"

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 1 | June 5, 2018 | E-mail from PIGSLEY at approximately 2:33 p.m. using email account ****pigsley@gmail.com to Rafferty |
| 2 | August 29, 2019 | E-mail from Rafferty at approximately 1:12 p.m. using email account ************@gmail.com to Bobcat salesperson |
| 3 | October 7, 2020 | E-mail from PIGSLEY at approximately 6:28 p.m. using email account ****pigsley@gmail.com to Rafferty |
| 4 | January 5, 2021 | Email from Rafferty at approximately 3:44 p.m. using email account ***************@gmail.com to PIGSLEY and Keolis Accounts Payable |
| 5 | October 27, 2021 | Text from PIGSLEY at approximately 9:19 a.m. from phone number ***-***-2408 to Rafferty |

All in violation of Title 18, United State Code, Section 1343.

14

## COUNT SIX
Conspiracy to Commit Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury further charges:

32.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-11 of this Indictment.

33.    From in or about July 2014 through in or about November 2021, in the District of Massachusetts, and elsewhere, the defendant,

JOHN P. PIGSLEY,
a/k/a "John P. Pigsley, Sr." and "Big John,"

conspired with Rafferty and others known and unknown to the Grand Jury to commit an offense against the United States, to wit, wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

COUNTS SEVEN—TWELVE
Attempt to Evade or Defeat Tax
(26 U.S.C. § 7201)

The Grand Jury further charges:

34.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-29 of this

Indictment.

35.     From in or about 2016 through in or about 2022, in the District of Massachusetts,

and elsewhere, the defendant,

JOHN P. PIGSLEY,
a/k/a "John P. Pigsley, Sr." and "Big John,"

did willfully attempt to evade and defeat the payment of a substantial part of the taxes due and

owing by JOHN P. PIGSLEY, a/k/a "John P. Pigsley, Sr." and "Big John," to the United States

of America for the tax years set forth below by committing the following affirmative acts, among

others:

| Count | Tax Year | Affirmative Act(s) |
| --- | --- | --- |
| 7 | 2016 | (a) Structuring transactions to evade reporting requirements<br>(b) Submitting and causing the submission of false information to the IRS |
| 8 | 2017 | (a) Structuring transactions to evade reporting requirements<br>(b) Submitting and causing the submission of false information to the IRS |
| 9 | 2018 | (a) Structuring transactions to evade reporting requirements<br>(b) Submitting and causing the submission of false information to the IRS |
| 10 | 2019 | (a) Structuring transactions to evade reporting requirements<br>(b) Submitting and causing the submission of false information to the IRS |
| 11 | 2020 | (a) Structuring transactions to evade reporting requirements |
| 12 | 2021 | (a) Structuring transactions to evade reporting requirements |

All in violation of Title 26, United States Code, Section 7201.

16

<u>COUNT THIRTEEN</u>
Filing a False Tax Return
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

36.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-29 of this Indictment.

37.     On or about March 12, 2022, in the District of Massachusetts, the defendant,

JOHN P. PIGSLEY,
a/k/a "John P. Pigsley, Sr." and "Big John,"

did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, of PIGSLEY and his spouse for the tax year 2016, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the Internal Revenue Service, and which return PIGSLEY did not believe to be true and correct as to every material matter, in that said return, among other false items, understated other income (Line 21, $0) and total income (Line 22, $111,330), whereas, as PIGSLEY then and there knew, he received materially more other income and total income than he disclosed on the Form 1040.

All in violation of Title 26, United States Code, Section 7206(1).

17

## COUNTS FOURTEEN—SEVENTEEN
Structuring Transactions to Evade Reporting Requirements
(31 U.S.C. § 5324)

The Grand Jury further charges:

38.　　The Grand Jury re-alleges and incorporates by reference paragraphs 1-29 of this Indictment.

39.　　On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

JOHN P. PIGSLEY,
a/k/a "John P. Pigsley, Sr." and "Big John,"

knowingly and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a) and the regulations promulgated thereunder, did cause and attempt to cause a domestic financial institution to fail to file a report required under Title 31, United States Code, Section 5313(a), and any regulation prescribed under any such section, and did so while violating another law of the United States and as part of a pattern of illegal activity involving more than $100,000 in a 12-month period:

| Count | Approximate Date | Description |
|---|---|---|
| 14 | October 1, 2018 | $4,900 Cash Deposit at TD Bank, Dodge St., Beverly, MA |
|  | October 1, 2018 | $2,900 Cash Deposit at TD Bank, Dodge St., Beverly, MA |
|  | October 1, 2018 | $1,500 Cash Deposit at TD Bank, Dodge St., Beverly, MA |
|  | October 1, 2018 | $3,000 Cash Deposit at People's Bank, Dodge St., Beverly, MA |
| 15 | February 20, 2019 | $8,800 Cash Deposit at TD Bank, Cabot St., Beverly, MA |
|  | February 20, 2019 | $8,000 Cash Deposit at Eastern Bank, Ryal Side, Beverly, MA |
| 16 | July 6, 2020 | $4,400 Cash Deposit at Eastern Bank, Enon St., Beverly, MA |
|  | July 6, 2020 | $4,900 Cash Deposit at Eastern Bank, Federal St., Danvers, MA |
|  | July 6, 2020 | $5,000 Cash Deposit at TD Bank, Dodge St., Beverly, MA |

| | | |
|---|---|---|
| 17 | February 23, 2021 | $500 Cash Deposit at TD Bank, Dodge St., Beverly, MA |
| | February 23, 2021 | $4,500 Cash Deposit at TD Bank, Dodge St., Beverly, MA |
| | February 24, 2021 | $5,000 Cash Deposit at TD Bank, Dodge St., Beverly, MA |
| | February 24, 2021 | $5,000 Cash Deposit at Eastern Bank, Enon St., Beverly, MA |

All in violation of Title 31, United States Code, Section 5324.

FRAUD FORFEITURE ALLEGATION

(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

40.     Upon conviction of one or more of the offenses in violation of Title 18, United

States Code, Sections 1343 and 1349, set forth in Counts One through Six, the defendant,

JOHN P. PIGSLEY,
a/k/a "John P. Pigsley, Sr." and "Big John,"

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offenses.  The property to be forfeited

includes, but is not limited to, the following assets:

     a.   the real property located at 145 School Street, Rygegate, Vermont;

     b.   the real property located at 15 Rezza Road, Beverly, Massachusetts;

     c.   the real property located at 30 High Street, Beverly, Massachusetts;

     d.   a 2019 Heartland Fuel 352 Camper, bearing vehicle identification number 5SFCG3927KE404401;

     e.   a 2021 Bobcat HYDRA-TILT, bearing serial number 857803019;

     f.   a 2020 Bobcat T76 T4 CTL, bearing serial number B4CE12021;

     g.   a Bobcat Pallet Fork HD, bearing part number 7294305;

     h.   a 2020 Bobcat T76 T4 CTL, bearing serial number B4CE12061;

     i.   a 2019 Bobcat E55 T4, bearing serial number AJ1915517;

     j.   a 2020 Bobcat SG60 Stump Grinder, bearing serial number 233005356;

     k.   a 2020 Vintage Outlaw 53' Trailer, bearing vehicle identification number 5BWUV5335L1000237;

     l.   a 2015 Ford F550 Super Duty with plow attachment, bearing vehicle

identification number 1FD0X5HT1FEC20181;

m. a 2015 Dodge Ram 3500 Longhorn, bearing vehicle identification number 3C63RRKLXFG602852;

n. a 2007 Genie S60 Man Lift, bearing serial number S60HC0714634;

o. a 2021 Bobcat E60 R2 T4 CE, bearing serial number B4GR12147;

p. miscellaneous heavy equipment for a 2019 Bobcat E55 T4; and

q. a 2019 Ford F350 Crew Cab, bearing vehicle identification number 1FT8W3DT0KEG29626.

41.    If any of the property described in Paragraph 1, above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendant --

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

## STRUCTURING FORFEITURE ALLEGATION
### (31 U.S.C. § 5317(c))

The Grand Jury further finds:

42.     Upon conviction of one or more of the offenses in violation of Title 31, United States Code, Section 5324, set forth in Counts Thirteen through Sixteen, the defendant,

### JOHN P. PIGSLEY,
a/k/a "John P. Pigsley, Sr." and "Big John,"

shall forfeit to the United States, pursuant to Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), any property, real or personal, involved in such offenses, and any property traceable to such property.

43.     If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 31, United States Code, Section 5317, and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the Court;

   r.   has been substantially diminished in value; or

   s.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 31, United States Code, Section 5317, and Title 28, United States Code, Section 2461(c).

22

A TRUE BILL

_____
FOREPERSON

_____
KRISTINA E. BARCLAY
ELYSA Q. WAN
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: April 4 , 2023
Returned into the District Court by the Grand Jurors and filed.

/s/ Noreen A. Russo
_____
DEPUTY CLERK

at 3:38 PM

23